**C. J. MANEY CO., Inc., et al. v. UNITED STATES.**

No. 45048.

Court of Claims.

Nov. 5, 1945.

This case having been heard by the Court of Claims, the court, upon the evidence and the report of a commissioner, makes the following special findings of fact:

1. Plaintiffs, C. J. Maney Co., Inc., and New England Foundation Co., Inc., are corporations organized and existing under the laws of Massachusetts, the former having its principal place of business at Somerville, Massachusetts, and the latter having its principal place of business at Boston, Massachusetts.

2. On August 4, 1936, the plaintiffs entered into a contract with the defendant, the latter represented by the Assistant Federal Emergency Administrator of Public Works as its contracting officer, whereby the plaintiffs agreed to furnish all labor and materials and perform all work required for the construction of the superstructure for Fairfield Court Housing Project, No. H-9601, at Stamford, Connecticut, for the consideration of $690,956.00. The contract provided that the work should be performed in strict accordance with the specifications, schedules, and drawings, which were made a part of the contract, and that the work should be commenced upon receipt by the plaintiffs of notice to proceed, and that the work should be completed within 250 calendar days from the date of the receipt of notice. The superstructures to be constructed consisted of three buildings of three stories each and five rows of houses of two stories each.

3. Notice was given by defendant and received by plaintiffs fixing the commencement day as August 13, 1936, and the completion day as April 19, 1937. Change orders, not involved in this suit, extended the completion date 123 calendar days. Plaintiffs completed the work on August 19, 1937, which was within the contract time as extended by the change orders. However, the work involved in the change orders did not actually delay the final completion of the contract more than about 53 days.

4. Under the terms of the contract, the surface of the ceilings in the various rooms of the buildings was the under-surface of the concrete slabs which divided the buildings into stories. This under-surface of the slabs which constituted the ceilings in the various rooms was not to be plastered but was to be painted.

5. The specifications relative to concrete work and forms provided inter alia as follows:

"1. Forms shall conform to the lines, dimensions, and shapes indicated on the drawings for the member for which provided. They shall be tight to prevent leakage of concrete and shall be securely braced and maintained in position to prevent any possibility of movement after the concrete is poured and insure safety to workmen and passersby.

&ast; &ast; &ast; &ast; &ast; &ast;

"4. Forms may be either lined or unlined but shall produce the following surfaces:

"(A) Exterior concrete surfaces exposed to view, interior exposed concrete surfaces in spaces where glazed finish tile or brick occurs, and interior exposed concrete surfaces in spaces where plastered walls occur (see Div. 'Plastering') shall be level and smooth to receive paint. The external angles of concrete beams and columns in these spaces which are not plastered shall be bevelled, the bevel being formed of smooth-grained wood strips.

"(a) The material used for form work shall produce a level, dense surface, free from honeycombing, joint marks, fins, bulges, depressions, or marks showing the grain of the wood forms. The requirement for level ceilings shall be construed to mean a ceiling in which the surface shall not vary from the level more than $\frac{1}{4}$ inch in 10 feet.

"(b) Any defects that may appear shall be rubbed smooth with carborundum stone, or by other means if necessary, until the surfaces meet with the approval of the Contracting Officer.

"(B) All exposed interior concrete surfaces, except in spaces where plastered walls occur and except in spaces indicated on the drawings as 'Pipe Spaces' shall be free from fins, and honeycombing, and equal

in all respects to surfaces produced by use of surfaced lumber forms.

"(C) All other surfaces of concrete work shall be equal to that produced by use of rough lumber forms. Fins and other surface defects need not be remedied, subject to the approval of the Contracting Officer."

6. The specifications relative to paint and painting contained a schedule in part as follows:

the Concrete specification the concrete has been rubbed or patched to eliminate irregularities, the paint shall be so applied as to render the rubbed or patched surfaces the same in appearance as untouched surfaces. This shall include stippling if necessary."

Plaintiffs elected to use Formula 11.

7. The concrete slabs, the lower surfaces of which constituted the ceilings of the rooms, were completed and the forms stripped therefrom about the middle of Feb-

| Surface and Items | Number and Kind of Coats Required | | |
| --- | --- | --- | --- |
| | First Coat, Formula No. | Second Coat, Formula No. | Third Coat, Formula No. |
| Interior Plaster, Concrete, and Fiber Board: | | | |
| Finished plaster surfaces, except as otherwise noted. | 9A or 9B.... | 10 or 11..... | 10 or 11. |
| Exposed concrete surfaces in spaces where finished plaster occurs (except as otherwise noted). | 9A or 9B.... | 10, 10A, or 11 | 10, 10A, or 11. |
| Exposed concrete surfaces in stair halls of Apartment Buildings (except floors, stair treads, and landings). | 9A or 9B.... | 10, 10A, or 11 | 10, 10A, or 11. |
| Utility room, walls, and ceilings......... | 9A or 9B.... | 3, 15, or 16.. | 3, 15, or 16. |
| Kitchen and Toilet Room walls and ceilings. | 9A or 9B.... | 3, 15, or 16.. | 3, 15, or 16. |
| Bathroom walls and ceilings (except fiber board). | 9A or 9B.... | 3, 15, or 16.. | 3, 15, or 16. |
| Fiber board ceilings ................... | 13 .......... | 3, 15, or 16.. | 5. |
| Keene's cement wainscots and Portland cement bases. (See specification for plastering.) Note.—Include fourth coat of Formula No. 5. | 9A or 9B.... | 3, 15, or 16.. | 3, 15, or 16. |
| Cement floors in Laundries ............ | 14 .......... | ............ | |

The specifications then provided under general notes supplementary to the schedule as follows:

"6. If Formula No. 10 is used, the Plaster Primer (Formula Nos. 9A or 9B) may be omitted. If Formula Nos. 10A or 11 are used, the Plaster Primer (Formula Nos. 9A or 9B) may be omitted at the Contractor's option, but if so omitted the Contractor will be held responsible for lime burns or other blemishes that may show through the paint and he shall remedy same at his own expense to the entire satisfaction of the Contracting Officer.

\*      \*      \*      \*      \*      \*

"10. Where painting of concrete surfaces is required, and where in pursuance to

ruary 1937, and on February 19, 1937, the defendant's project engineer, J. M. Curley, wrote plaintiffs a letter in part as follows:

"In regard to the ceilings, as you are aware, there are a great many irregularities and imperfections which, in the writer's opinion, must be removed before the paint is applied. These irregularities and imperfections, as you are aware, become more pronounced and visible when the paint is applied to the ceilings, as you will note in Building 'D–1' where a sample of the paint has been applied.

"In connection with this matter of painting the finished concrete surfaces it would be well to refer again to page 71, Section 8, describing the forms, wherein it is pointed

out the extreme care which must be exercised in the selection of materials and in the erection of the forms so that the exposed concrete surfaces would be level and smooth to receive paint; and, of course, the painting specifications on page 164, Section 3, paragraphs 6 and 10 augment the foregoing concrete specifications concerning forms to require a uniform, desirable and acceptable finish on these ceilings.

"In view of the fact that your painter has expressed the intention to use Formula No. 11, and thus omit the plaster primer, and by such use the ceilings will receive but two coats of paint, you are advised that you will be held strictly responsible for lime burns or other blemishes that may show through the paint, and further that you are required to remedy same at your own expense and to the entire satisfaction of the Contracting Officer.

"The writer cannot stress too much the fact that a great deal of thought should be given to the manner in which you treat these ceilings before paint is applied, so that when the painting of concrete surfaces is completed you will have attained the result required by the Specifications."

The concrete work was well done, except that it did not comply with the specifications in that fins had been left in the concrete which developed at the place where the concrete forms came together. These fins consisted either of protuberances where the concrete had run down between the two forms, or of depressions in the surface. After receipt of the above letter plaintiffs did some experimental work in undertaking to remove these fins, but did not succeed in doing so to the extent necessary to make an acceptable job, since after the paint had been applied the fins still appeared.

Had the concrete work been constructed in accordance with paragraph 4 (A), (a), and (b) of the specifications, ceilings would have been produced that would have been sufficiently level and smooth to have received the paint and would have produced a satisfactory paint job by the use of the paints specified, but the removal of these fins was expensive and they were not removed, but an alternative was adopted, as later appears.

8. Defendant's project engineer, on April 12, 1937, again wrote to plaintiffs, called their attention to the specifications relative to concrete and painting, and said:

"These concrete ceilings at the present time are not ready to receive paint. They are uneven, contain many pits and projections, show the joints made by the forms, and have many other imperfections. * * *

"These ceilings must be rubbed smooth in accordance with specification requirement to receive paint. They are not acceptable in their present state * * *.

"This office wishes to emphasize and make clear the fact that these ceilings must comply with the specification requirements in every respect and we also wish to urge that you take immediate steps to correct and smooth these concrete ceilings before any paint is applied."

9. On April 26, 1937, at the request of plaintiffs, a representative of the defendant went to the site and examined the several ceilings which plaintiffs had painted in experiments without prior full preparation of the concrete, but none of them were acceptable. On April 27, 1937, the presidents of the plaintiff companies went to Washington and talked to the defendant's chief engineer of inspection, and at his suggestion later looked at a project then under construction at Harlem, but nothing important came of this.

10. On May 13, 1937, defendant's project engineer wrote plaintiffs as follows:

"Please refer to the writer's letter to you dated April 12, 1937.

"The writer wishes to point out to you that since the date of the above mentioned letter no further progress has been made in connection with these ceilings and that painting of same has now been put off for a considerable length of time.

"It might be pertinent at this point to state that in view of the fact that the extended date of completion of your contract is May 4, 1937, you are now in technical default and it seems imperative that you take every means possible to proceed with the painting of these ceilings without any further delay."

11. Plaintiffs' paint subcontractor, Browning Decorating Company, had refused to paint the ceilings without the plaintiffs either preparing the concrete or giving it a letter assuming full responsibility for putting on the paint without previous preparation of the concrete, so on May 17, 1937, under an agreement with plaintiffs, the E. K. Perry Company, a widely experienced painting contractor of

Boston, Massachusetts, sent some of its men to the site in an endeavor by experiment to produce satisfactory results on a few ceilings without previous full preparation of the concrete, but nothing they produced was satisfactory, mainly because the lines or ridges left by the form joints, even after rubbing and grinding, still showed through the paint.

12. Beginning about May 21, 1937, plaintiffs sent telegrams and letters to defendant contending in effect that the specifications as to concrete and painting were defective in that full compliance therewith would not produce an acceptable ceiling.

In the meantime, and on May 25, 1937, J. G. Gholston of defendant's inspection division, wrote plaintiffs a letter telling them that on some concrete ceilings satisfactory results had been obtained by applying one coat of casein-bound, textured paint of certain characteristics, one coat of washable casein paint of certain characteristics, and one coat of tint. Plaintiffs tried this on a ceiling or two but it did not produce a satisfactory ceiling.

Some of the correspondence referred to is set out in detail in the following finding.

13. On May 21, 1937, plaintiffs sent the following telegram to the Director of the Inspection Division of the Federal Emergency Administration of Public Works in Washington:

"In reference to painting concrete ceilings Stamford Connecticut stop several concrete ceilings which have been painted in accordance with contract requirements have been rejected by project engineer stop in an endeavor to produce a ceiling which would be approved we have painted several ceilings using materials and methods exceeding contract requirements but these also are unsatisfactory to project engineer stop the results he insists upon cannot be obtained by the methods and materials specified nor can it be obtained by other materials and or methods which we have tried stop therefore please advise how you desire us to proceed in order that there may be no further delay and resultant expense because of this matter."

On May 25, 1937, plaintiffs sent the following telegram to the same officer:

"Please reply to our telegram of May twenty-first regarding painting Stamford project stop all other work except that dependent on completion of painting is sub-

stantially completed stop your failure to advise us how to proceed is causing delay and expense for which we hereby make claim."

On May 25, 1937, the Director of the Inspection Division wrote plaintiffs as follows:

"Reference is made to your telegram dated May 21 concerning the painting of concrete ceilings on the Fairfield Courts project, Stamford, Connecticut. It is assumed that your telegram refers to difficulty in complying with Specifications, Division XXIV, Painting. Section 3, paragraph 10, reading as follows:

" 'Where painting of the concrete surfaces is required, and where in pursuance of the concrete specification the concrete has been rubbed or patched to eliminate irregularities, the paint shall be so applied as to render the rubbed or patched surfaces the same in appearance as untouched surfaces. This shall include stippling if necessary.'

"For your information you are advised that a treatment of concrete ceilings as described below has produced satisfactory results on other projects where similar conditions have been encountered.

"(a) One coat of Casein Bound Textured Paint of an approved make and complying with the following:

"Casein Bound Texture Paint shall be a dry powder paint which is to be mixed with water to prepare it for use and shall show the following analysis:

Casein—Factor Nitrogen 7.7 Minimum 10%
Mica—Properly graded Fine Minimum 20%
Hydrated Lime ..........Minimum 03%

"Remainder to be properly balanced fillers; it shall be free from the compounds of mercury or other poisonous preservatives.

"The resultant Casein Bound Textured Paint shall be a finely ground uniform mixture which disperses easily when mixed with water and which is free from lumps; it shall require 90 to 100 CC of Water per 100 grams for material producing a minimum texture, or 120 to 130 CC for light textures; it shall apply readily and shall not roll up under the brush or pull excessively, it shall take and hold various textures and shall show no tendency to melt, sag or break; it shall dry hard over night with no cracking on medium textured [sic] and no chalking on light textures.

"This paint shall be applied so as to produce a stippled finish of approved texture; and

"(b) Over the Casein Bound Textured Paint apply one coat of washable casein paint complying with Federal Specification No. TT–P 23, Section E–3, Grade B, Type II.

"(c) Finished coats on both plastered and concrete surfaces shall be of tint or tints as selected by the Contracting Officer and shall also comply with the requirements of the division 'Painting' under the heading 'Colors.'

"Properly prepared concrete ceilings when treated as outlined above have produced acceptable finished surfaces on other projects.

"It is suggested that a sample ceiling be prepared in accordance with the above and if found to produce a satisfactory result on Fairfield Courts, a proposal to change the contract requirements without change in contract time or price will be entertained by the Government."

On June 3, 1937, defendant's Director of the Inspection Division telegraphed plaintiffs as follows:

"Assistant Chief Engineer Frank Anderson will be in Stamford Friday morning with full authority to settle question of acceptable finish of concrete ceilings stop presence of your authorized representative requested."

14. After further experiments and trips to the job by defendant's inspectors and engineers it was found that with very little, if any, preparation of the concrete, ceilings acceptable to the defendant could be obtained by the use of a casein-bound, textured paint and a second coat of casein paint very much like the paint described in Mr. Gholston's letter of May 25, 1937, outlined in finding 12. This was in the early part of June 1937, and defendant requested that as a condition to its agreement to accept the ceilings painted with the casein-bound, textured paint and second coat of casein paint, in lieu of previous full preparation of the concrete and the use of the specification formula paint, the plaintiffs should make a covering proposal providing for no additional payments to plaintiffs and no extension of the contract time. Since plaintiffs kept up their contention, stated in findings 12 and 13, they did not make such a proposal, but on or about June 14, 1937, began the painting as above described in

this finding and carried it on through to completion, and defendant accepted the ceilings as satisfactory.

After the work had been finished plaintiffs presented defendant with an itemized statement of a claim for excess costs, with supporting documents.

15. It cost the plaintiffs more to put on the textured paint that they actually put on than it would have cost them to put on the formula paint called for in the specifications, but the elimination of the full preparation of the concrete more than offset this additional expense. The delay in doing the painting resulted in a delay in the final completion of the contract with a resulting increase in overhead expense.

The excess cost of using the substituted paint, plus overhead during the period of delay, is $9,243.03, made up of the following items:

| | |
|---|---|
| 1. Additional labor and material, including cost of workmen's compensation and liability insurance | $5,100.46 |
| 2. Less credit from subcontractor | 735.01 |
| | 4,365.45 |
| 3. Plus 10% overhead | 436.54 |
| | 4,801.99 |
| 4. Plus 10% profit | 480.20 |
| Net total | 5,282.19 |
| 5. Overhead during period of delay | 3,600.76 |
| 6. Plus 10% profit | 360.08 |
| Total | 3,960.84 |
| Grand total | $9,243.03 |

This excess cost, however, was incurred on account of the failure of the plaintiffs to prepare the concrete in accordance with paragraph 4 (A), (a) and (b) of the specifications. Any delay that may have been incurred in doing the painting was due to plaintiffs' failure to prepare the ceilings in accordance with the before-mentioned paragraph of the specifications.

16. On June 29, 1937, defendant's project engineer demanded that the plaintiffs paint the kitchens, utility rooms and toilet rooms with two additional coats of oil paint, although plaintiffs had painted the kitchens, utility rooms, and toilet rooms

with two coats of casein paint as required by Assistant Chief Engineer Anderson. Because of the demand of the project engineer two coats of oil paint were also applied to these rooms.

On July 12, 1937, plaintiffs wrote to the Director of the Inspection Division of the Federal Emergency Administration of Public Works objecting to the requirement of the project engineer that the ceilings of the kitchens, utility rooms, and toilet rooms be painted with oil paint and advising the Director that the cost of painting the ceilings of these rooms in this manner would be made a part of the plaintiffs' claim.

On September 2, 1937, H. A. Gray, Director of Housing of the Federal Emergency Administration of Public Works ruled that the plaintiffs should not have been required to apply the oil paint to the ceilings of the kitchens, utility rooms, and toilet rooms and advised the defendant's project engineer as follows:

"It is noted that the Contractor has proceeded to paint these kitchens with casein-bound textured paint and has finished them with a coat of washable-casein paint. It is also noted that the Project Engineer has ruled that in addition the Contractor must furnish two coats of oil paint over the textured paint on the ceilings of the rooms in question.

"In view of the fact that the authority to modify the painting requirements was granted in an endeavor to make the ceilings more presentable than they would have been had the original specifications been followed, I do not consider that it would be equitable to require the Contractor to furnish additional coats of oil paint. You are, therefore, requested to inform the Contractor through the Project Engineer that I do not consider that the contract as modified required the additional coats of paint."

The proof does not show the cost of putting on these two additional coats of oil paint in the kitchens, utility rooms, and toilet rooms. Whatever it may have cost is included in plaintiffs' claim for the cost of using the substituted paint, but the amount of it does not separately appear.

Dean Hill Stanley, of Washington, D.C. (Joseph R. McCuen, of Washington, D.C., on the brief), for plaintiff.

Frank J. Keating, of Washington, D.C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

Plaintiffs had a contract for the construction of the superstructures for the houses in the Fairfield Court Housing Project at Stamford, Connecticut. Included in the contract was the painting of the concrete ceilings in the dwellings. Plaintiffs were unable to paint these ceilings to the satisfaction of the contracting officer by using the paint specified, and finally used a different sort of paint which produced a satisfactory job. The excess cost of the substituted paint and labor and overhead and profit was $9,243.03. For this amount plaintiffs sue.

Defendant does not deny that this excess cost was incurred in doing the paint job, but it says that plaintiffs' failure to prepare the concrete ceilings in the manner specified was the thing that made it necessary to use a different paint from that specified and, hence, that it is not liable for the excess cost.

Paragraph 4 of the specifications relates to concrete work. Paragraph (A), with subparagraphs (a) and (b), relate to exterior concrete surfaces exposed to view, to interior exposed concrete surfaces in spaces where glazed-finish tile or brick occurs, and to interior exposed concrete surfaces in spaces where plastered walls occur. Paragraph (B) relates to interior concrete surfaces, except in spaces where plastered walls occur and except in spaces indicated on the drawings as "Pipe Spaces." Paragraph (C) relates to all other surfaces of concrete work. The painting in controversy was of interior exposed concrete ceilings in rooms with plastered walls and these concrete ceilings, therefore, are governed by paragraph (A) and subparagraphs (a) and (b). They are not governed by paragraph (B) because there is excepted from its provisions "spaces where plastered walls occur." Paragraph (B) evidently refers to the ceilings in basement rooms or other rooms the walls of which were not plastered. The concrete ceilings of those rooms the walls of which were plastered are governed by paragraph (A).

The concrete work governed by paragraph (A) was the best of that specified; that governed by paragraph (B) did not have to be quite so level and smooth; and that governed by paragraph (C) could be

even rougher. Paragraph (A) required that the concrete surface should be "level and smooth to receive paint," and it further specified in subparagraph (a) that the material used for form work should produce "a level, dense surface, free from honeycombing, joint marks, fins, bulges, depressions, or marks showing the grain of the wood forms." It was further required in subparagraph (b), "Any defects that may appear shall be rubbed smooth with carborundum stone, or by other means, if necessary, until the surfaces meet with the approval of the contracting officer."

The concrete surfaces mentioned in paragraph (B) also had to be free from fins and honeycombing, but this paragraph made no mention of "joint marks, fins, bulges, depressions, or marks showing the grain of the wood forms."

It is not denied that the concrete in the rooms, the walls of which were plastered, did have fins and were not sufficiently level and smooth to receive the paint specified.

■ Plaintiffs tried a number of times to paint these ceilings so that the fins and depressions and other rough places in the concrete would be hidden, but they were unable to do so. After the paint had been applied the fins still appeared. Plaintiffs tried to remove these fins by the use of carborundum stone, but still were unable to do so successfully. After the paint was applied the fins still appeared. The contracting officer, therefore, was wholly within his rights in rejecting the work.

Quite a good deal of time was consumed in trying to produce a satisfactory result, and finally one of defendant's employees in its Inspection Division suggested to plaintiffs the use of a different sort of paint, and plaintiffs finally succeeded in obtaining satisfactory results by using a paint very similar to that suggested by defendant. Defendant then told plaintiffs it would agree that they might use this substitute paint instead of requiring them to prepare the concrete in the way specified, but with the understanding that no additional payment should be made to plaintiffs and no extension of the contract time would be granted.

Plaintiffs refused to agree to this because they insisted that the paint specified would not produce a satisfactory result, but they did proceed to paint the ceilings with the substituted paint; and at the conclusion of the work they presented their claim for the excess cost.

■ The evidence leaves no doubt that the ceilings had not been prepared in the way called for by the specifications, and we are of opinion that this is the reason that the paint specified would not produce a satisfactory job. In order to properly prepare the ceilings plaintiffs would have been required to do a great deal of work, which would have cost more than it cost them to use the substituted paint. Instead of doing this, they used the more expensive paint. Its use would not have been necessary if the concrete surfaces had been properly prepared.

■ Plaintiffs also complain of the requirement of the Project Engineer that two additional coats of oil paint should be applied in the kitchens, utility rooms, and toilet rooms; but whether this requirement was proper or not, plaintiffs are not entitled to recover on this account because the proof does not show the cost of this item. Whatever it may have cost is included in plaintiffs' general claim for the additional cost of using the substituted paint. The cost of this item is not separated from the total excess cost.

Plaintiffs are not entitled to recover. Their petition will be dismissed. It is so ordered.

WHALEY, Chief Justice, and JONES and LITTLETON, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.